## Jules E. Roemheld et al. v. City of Chicago.

### Gen. No. 12,932.

1. COMMISSIONER OF PUBLIC WORKS—*presumption of inspection of work by.* The commissioner of public works being the officer designated by ordinance and contract to inspect work being performed for the city, the presumption is that he has performed his duty and has inspected such work.

2. MUNICIPAL CORPORATION—*when liable for extras.* Where work and labor in addition to that provided for by a written contract is performed by a contractor for a municipal corporation, such corporation is liable therefor if such extra work and labor was furnished pursuant to the direction of the duly authorized agent of such corporation who inspected the same, notwithstanding the ordinance

and contract pertaining to such work and labor provides that all deviations from the contract provisions must be upon written authority of such agent. Written orders, likewise, which authorize such changes, if made by those delegated to make the same by the municipal agent specified in the contract, are sufficient to establish a waiver.

Action of *assumpsit*. Appeal from the Superior Court of Cook county; the Hon. AXEL CHYTRAUS, Judge, presiding. Heard in this court at the March term, 1906. Reversed and judgment here. Opinion filed January 7, 1907.

**Statement by the Court.** The appellants, Jules E. Roemheld and John J. Gallery, were plaintiffs, and appellee was defendant, in the trial court, and will be so referred to here. The suit is *assumpsit* for extra material used and alterations made in the work of performing certain contracts between plaintiffs and the city of Chicago. The declaration consists of the common counts in *assumpsit,* and the defendant pleaded the general issue. The cause was submitted to the court for trial, without a jury, by agreement of the parties, and the court found the issues for the defendants and rendered judgment on the finding.

There is no dispute as to the facts, which are substantially as follows: June 21, 1900, the plaintiffs contracted with the defendant, by two separate contracts, to construct two bridges, one over the Calumet river, in the city of Chicago, called the Ninety-fifth street bridge, and one at Division street in said city, called the Division street bridge, in accordance with plans and specifications for the two bridges. The specifications for the two bridges are substantially the same, and it was agreed by the parties on the trial that the specifications for the Ninety-fifth street bridge, which were put in evidence, might stand as the specifications for both bridges. The evidence is that the Ninety-fifth street bridge was to be somewhat heavier than the Division street bridge. General plans or drawings of the bridges were prepared

and placed on file in the department of public works of the city, in accordance with which the bridges were to be constructed, which general plans or drawings were furnished to contractors who desired to bid on the work, and bids were made on these plans or drawings and the specifications. The total contract price for the Ninety-fifth street bridge was $225.000, and that for the Division street bridge $200,000. It was admitted by defendant's attorney, on the trial, that the contracts were lawfully let to the plaintiffs. After the execution of the contracts, the American Bridge Company, a subcontractor of the plaintiffs, made, by its engineer, working drawings for the construction of the bridges. These working drawings were in strict accordance with the original plans or drawings and specifications on file in the department of public works, and on which the bids were made and the contracts let. The working drawings were submitted to John Ericson, the city engineer, and head of the bureau of engineering of the city. His general duties are prescribed by sections 1644 and 1645 of the Municipal Code of Chicago, which sections are as follows:

Section 1644. "The city engineer shall perform such duties as may be required of him by the commissioner of public works, or ordinance of the city, and shall also perform such service in the prosecution of public improvements as may require the skill and experience of an engineer."

Section 1645. "He shall have charge of the construction, repairing and building of bridges, viaducts and water works, and shall superintend the laying of all mains, supplies and water works."

At the time the working drawings were submitted to the city engineer, there were under him, in the employ of the city, Willmann, city bridge engineer, Pihlfelt, first assistant bridge engineer, and Ralph Modjeski, consulting and assistant bridge engineer, who, July 1901, was put in charge of the construction of the bridges. The working drawings were referred

Roemheld v. City of Chicago.

to Mr. Modjeski, who made notations on them indicating increases in materials and in the character of the machinery to be used, and new working drawings corresponding with Modjeski's notations were made by the civil engineer in the employ of the American Bridge Company, who made the original working drawings. After the working drawings were so changed. each of them was approved and signed by John Ericson, city engineer, Ralph Modjeski, consulting and inspecting engineer, and Thomas G. Pihlfelt.

There are seventy-six of the changed working drawings, and, after they were so approved and signed, they were presented to Mr. F. W. Blocki, the commissioner of public works, for his approval and signature, and next after the word "Approved" in the drawing marked "1," he signed thus: "F. W. Blocki, commissioner of public works." Thomas G. Pihlfelt testified that he took the drawings to Mr. Blocki for his signature, and Blocki said, "Do I have to sign all of these?" and witness said. "I don't know; they are drawings based on the original drawings and the contract accepted by the city," and that he did not know whether it was necessary to sign them. Mr. Blocki looked the plans over and said, "I guess the bridge will be built just the same," and he signed one of the sheets, and I took the plans away. "Mr. Blocki's objection to signing them was merely on account of the labor involved; he was very busy at the time when I was down there; he didn't want to take the time to sign them; however, he signed one of them." Mr. Blocki's evidence substantially corroborates that of Pihlfelt. He says he started to sign the working drawings, but was busy and doubted the absolute necessity of it, and did not finish signing them. When the original drawings were submitted to the city engineer, the construction of the greater part of the foundations or substructures of the bridges had been made. Mr. Blocki, on cross-examination, testified: "If there were any changes

in the detailed plans, in the weight of material or otherwise, from the specifications or from the general plans, those were probably ordered by some of the city officials in the engineering department. That, at least, is the general rule. Whether they followed that practice here, or not, I don't know." It clearly appears from the evidence that no change in the original working drawings, which were prepared by the American Bridge Company and submitted to the city engineer, was suggested by the plaintiffs, or either of them; that they were all suggested by Mr. Modjeski.

John J. Gallery, plaintiff, testified that, in 1902, he asked Mr. Blocki if he would sign the drawings, and he said, "All right, I'll sign them; put them on the desk," and said that he had not time then, but would sign them later on, and that, subsequently, in the month of March, 1903, he said to witness that, if he signed the plans, we would have to be paid for the extra iron we put in. He also said that he would help us to get that money due us for that extra iron with the finance committee, and would recommend that it be paid to us. I had conversations of this character subsequent to the dates of these vouchers introduced in evidence. Before the vouchers were paid Mr. Blocki said: "Well, we will pay you what is due you straight, and then on this extra work we will see what the finance committee will say for you. I will help you all I can to get your money. You are justly entitled to that money." By vouchers, the witness means their receipts for the moneys due by the terms of the original contracts, exclusive of extras. The witness, Gallery, further says: "We signed the vouchers with the understanding that the extra claims were left over; that is, the claims we are suing for in this case." Mr. Blocki admits, in his testimony, that he said to Gallery, "All right, I will sign them," but says this was before he was aware that signing the drawings would approve them.

Plaintiffs constructed the bridges in accordance with the second set of working plans prepared by the American Bridge Company, in accordance with the notations of changes made in the office of the city engineer. The bridges were completed in April or May, 1903, and the city accepted them.

The changes indicated by the second set of drawing were numerous and substantial, and necessarily involved large. expense. The general character of the changes, and the manner in which the estimate of their value was made, is thus testified to by the plaintiff, Mr. Roemheld: "Some of the changes were changes in dimension, length, etc. Others were for increase in material, and that is what we are claiming for. I have figured up, in connection with the plans and the changes in the working drawings and the unit prices fixed in the contracts, the. exact amount in value and prices of the material in these changes. I checked off and went over the calculations with Mr. Pihlfelt. My figures and Mr. Pihlfelt's, after we checked them up together, finally agreed." The evidence is uncontradicted. The total cost of the changes in the Division street bridge is $9,910.48, and the total cost of the changes in the Ninety-fifth street bridge is $10,132.34.

Wood, Fyffe & Adcock, for appellants.

William D. Barge, for appellee; James Hamilton Lewis, Corporation Counsel, of counsel.

Mr. Justice Adams delivered the opinion of the court.

Counsel for the city says, in his argument: "There is no dispute whatever about the facts in this case," which is true. Therefore, the question to be decided is one of law.

The sole contention of the city, by its counsel, is that the changes in. the construction of the bridges

were made by the plaintiffs without any written order therefor by the commissioner of public works. In support of this contention, counsel relies on section 1609 of the city ordinance, which is as follows:

Section 1609. "No payment shall be made on any work or job done by contract, for any extra work not specified in the contract, unless such extra work shall have been done by the written order of the commissioner of public works, to be annexed to such contract, directing the same, and stating that such work is not included in the contract; Provided, that any order given under this section shall state what the extras are, and that such extras are necessary for the proper completion of, or for the security of the work previously done, and the reasons therefor."

The contract also provides for a written order, but this is not mentioned by counsel for the city.

In City of Elgin v. Joslyn, 36 Ill. App. 301, the suit was by Joslyn, a contractor, against the city, for extra work and material not included in his written contract with the city. The contract was for the construction of certain buildings connected with the water works of the city. There was a clause in the specifications for the work, providing: "No extra work will be paid for or allowed unless the same was done upon the written order of the engineer.  *  *  * All claims for extra work must be made to the engineer in writing, before the payment of the next succeeding estimate, after the work shall have been performed, and, failing to do this, the contractor shall be considered to have abandoned his claim." The suit was defended on the ground, among others, that the work claimed as extra was done without the written order of the engineer. In respect to this the court say: "The provisions of the clause are mutual. The proof is, in this case, that the engineer of the city and the city officers, the water commissioners, had charge and supervision of this work, and were constantly proposing and requiring changes and departures from the original plans, and that

many of these changes were of a material and important character, involving more expense than the original plans.   One witness, at least, swears that the finished work could hardly be recognized by looking at the original plans.   Under the provision in question, if the engineer and the city, which he represented, intended to enforce that provision against the contractor, and avail themselves of its benefits, then it was their duty also to obey it; and it was the duty of the engineer, or the commissioners, when they ordered extra work, to put it in writing themselves. By the strict letter of this clause, no extra work is allowed to be done, except it is ordered by the. engineer in writing.   He is to make the order, and must put it in writing, and his omission to do his duty, and comply with the contract, cannot be invoked to aid the defendant; nor can the defendant omit to comply with its part of the requirements of that clause and, at the same time, insist on a strict compliance with it on the part of the appellee.   The neglect of the defendant to keep its part of that clause must be held to be a waiver of the right to insist on the plaintiff keeping his part of it.''   The judgment of the Appellate Court was affirmed by the Supreme Court.   City of Elgin v. Joslyn, 136 Ill. 525.

The contract in this case expressly provides that all of the work contracted for shall be done ''under the immediate direction and superintendence of the commissioner of public works of the city of Chicago, and to his entire satisfaction, approval and acceptance,'' and that ''all material used, and all labor performed shall be subject to the inspection and approval or rejection of said commissioner.''   The presumption of law being, that, in the absence of evidence to the contrary, an officer has performed his duty, it must be presumed that the commissioner of public works superintended the construction of the bridges, as provided by the contract, and, therefore. must have known of the changes which were being

made. He must also have accepted the bridges, including the changes, because otherwise the original contract prices would not have been paid, as he alone could issue vouchers or estimates for the work.

The contract also contains the following clause:

"Should the commissioner of public works deem it proper or necessary, in the execution of the work, to make any alterations which shall increase or diminish the expense, such alterations shall not vitiate or annul the contract or agreement hereby entered into, but the said commissioner shall determine the value of the work so added or omitted, such value to be added to or to be deducted from the contract price, as the case may be."

This clause authorized the commissioner to order alterations which might increase the cost of the work.

In Cincinnati v. Cameron, 33 Ohio St. 336, Cameron, by his contract, agreed not to make any alterations or modifications in the work, or make any claim for such, unless ordered in writing so to do. This agreement was required to be included in all contracts made by the city, by an act of the legislature. The court held that the provision was intended for the benefit of the city and might be waived, and was waived by the city. *Ib.* 360 *et sequens.* In that case the board in charge of the work had adopted the practice of giving oral orders, deeming written ones unnecessary, and the court held this an abandonment of written orders. *Ib.* 372.

Wood v. Fort Wayne, 119 U. S. 319, was a suit by the plaintiffs, Wood *et al.,* in part to recover for work and materials, extra to a contract between plaintiffs and the city of Fort Wayne, for the construction of water works in the city. The contract contained the following paragraphs:

"And it is hereby agreed that no claim for extra work shall be made or entertained, unless such extra work shall have been done in obedience to a written order of the engineer and trustees, and a stipulated

price for same agreed upon, whenever such stipulation may be practicable.    When otherwise, such claims to be made to the trustees in writing within ten days after the completion of such extra work, or before the payment of the next succeeding monthly estimate after such work is done, failing to do which all rights of the contractor to such extra pay shall be forfeited.

"The said trustees shall have the right to make any alterations in the extent, dimensions, form, or plan of the work contemplated by this contract, either before or after the commencement of construction. If such alterations diminish the quantity of work, the price paid shall be proportionately diminished, and no anticipated profits allowed for the work omitted.    If they increase the work, such actual increase to be paid for at contract rate for work of its class."

In respect to these paragraphs the court say: "The clause providing that no claim for extra work shall be made or entertained, unless such extra work shall have been done in obedience to a written order of the engineer and trustees, is an independent clause from that which provides that the trustees shall have the right to make any alterations in the plan of the work, either before or after its commencement; and the extra work referred to in the former clause does not embrace work done in pursuance of an alteration made by the trustees in the plan.    The latter work may be, in one sense, extra work, but if it results from an alteration of plan by the trustees, and there is, in consequence, an increase in the quantity of work, the actual increase is to be paid for, at the "contract rate for work of its class."    The extra work referred to in the former clause required the authoritative written order of the engineer and trustees; but as the trustees had the right to alter the plan, work done to carry out such alteration, when made by the trustees, was authorized by the trustees, in a manner equivalent to a written order by them and the engineer.    The change of plan in-

volved in crossing Clinton street, was authority for the additional cost of crossing there, without a written order." Ib. 320.

In Ford v. United States, 17 C't of Claims Rep. 60, Ford et al. contracted with Major Walter McFarland, who acted for and on behalf of the United States, for work and repair and improvement in the first section of the canal around Big Muscle Shoals in the Tennessee river. The contract provided that the plaintiffs would make no claim for or on account of extra work, or materials unless such extra work or material should have been expressly required, in writing, by McFarland, or his successor, the prices and quantities thereof having been first agreed on by the contracting parties and approved by the chief of engineers. The plaintiffs did extra work at the request of the engineer in charge of the work, which request was not in writing, and payment was resisted on the ground that the work was not required in writing. The court say: "We are aware of no principle of law by virtue of which courts can transmute a contract into a statute of frauds, and attach to the voluntary agreement of the parties the irrevocable and mandatory attributes of an act of Congress. The law-making power, upon consideration of public policy, may declare certain contracts void and certain transactions remediless; but where one man renders service or furnishes material to another with his consent or at his request, the law implies a contract, and no prior agreement of the parties can render a transaction illegal and void which the law declares to be legal and valid. Such provisions as that above quoted were devised and introduced into building contracts to control and limit the power of architects or superintendents, to the end that the owner should not be led into an unauthorized expense through the orders and directions of his agents. As to the principal, such provisions merely impose a condition which may be waived."

In the present case the changes for which the extra materials were used were approved in writing by the city engineer, who, by section 1645 of the ordinance, has "charge of the construction, repair and building of bridges," and also by Ralph Modjeski, the inspecting and consulting engineer, and it appears from the evidence of Mr. Blocki, the commissioner of public works, that the general rule of his department was, that any changes in the detailed plans in the weight of material, or otherwise, from the specifications, or from the general plans, are ordered by some of the officials in the engineering department. In other words, the commissioner practically adopted such orders of the engineering department, which is a subordinate department of the department of public works, as his orders. In Cameron v. Cincinnati, *supra*, it was held that such practice was an abandonment of the requirement to give orders in writing.

The seventy-six working drawings, approved and signed by the city engineer and his assistant engineers, were all presented, so approved, to the commissioner of public works for his signature and approval, and he approved and signed one sheet of the drawings, and only omitted to sign the remaining sheets because of the labor and time it would require, and because, as he says, he doubted the necessity of signing. We think that, under the circumstances, it should be held that this was a sufficient "written order" directing the changes. The plaintiffs are not, as we think, in fault in the matter. They, in good faith, caused working drawings to be made, conforming exactly to the general plans and specifications on which they made their bids, and submitted those drawings to the city engineer, and his assistant and consulting engineer, with his approval, and without any suggestion of change by the plaintiffs, changed the drawings, by notations thereon, so as to require a very large increase of expensive material, and returned them to the plaintiffs, with the notations, thus

requiring the plaintiffs to procure new drawings showing the noted changes. They went on, in good faith, and did the work, inclusive of the changes required, and it is difficult to perceive how they could have done otherwise. The work was approved and accepted by the commissioner and the city, and, at the time of the trial, the bridges had been in service two years. The commissioner, in fact, approved the changes. He said to the plaintiff, Gallery, after the two bridges had been completed: ''Well, we will pay you what is due you straight'' (meaning the prices fixed by the original contract), ''and then, on this extra work, we will see what the finance committee will say for you. I will help you all I can to get your money. You are justly entitled to that money.'' We agree with Mr. Blocki, the commissioner, that the plaintiffs are entitled to be paid for the extra material, and disagree with the trial court, which held the contrary. There is no dispute as to the amount due them for the extra material. Mr. Roemheld testified, without contradiction: ''My figures and Mr. Pihl-felt's, after we checked them up together, finally agreed. The claims which we make here are claims, as far as mere figures go, about which we came to an agreement with the city officials and the bridge department.''

As previously stated, the total price of extras in the construction of the Division street bridge is $9,910.48; and the total in the construction of the Ninety-fifth street bridge is $10,132.34; being in all $20,042.82.

The judgment will be reversed and judgment will be entered here for the appellants, Jules E. Roemheld and John J. Gallery, and against the appellee, the City of Chicago, for the sum of twenty thousand and forty-two dollars and eighty-two cents ($20,-042.82); the appellants to recover their costs in this court and in the Superior Court of Cook County.

*Reversed and judgment here.*